Good morning. Before we begin, I'd like to just remind you that these microphones do not amplify, so the people in back of you can't hear a word unless you speak up. They do record, however. The clerk will call the case, please. 1417 Holden Construction Systems, Inc. v. Fagelhaber, LLC And if counsel could step forward and introduce yourselves, please. Good morning. Ray Rudman for the Clean Up Appellant Construction Systems. Good morning, Your Honors. Karen DeGrand for the Defendant Appellee, Fagelhaber. Thank you very much, counsel. You can start. Your Honor, I'd like to reserve five minutes for rebuttal. Thank you. May it please the Court, there are two issues that are here before the Court today, the first being whether the mutual and general release that I have additional copies if the Court requires them, but if the mutual and general release regarding an outstanding legal fee dispute bars a future claim of legal malpractice. And then the second issue is whether Construction Systems in a legal malpractice action is entitled to receive prejudgment interest under the Illinois Mechanics Lien Act. A brief history of the facts, Construction Systems is a Minnesota corporation. It's a steel company, and they were hired on a project on 6 North Michigan Avenue on May 30, 2012. This project was a disaster from day one. In fact, two of the owners, one went to jail, another one fled the country. There were multiple subcontractors coming and going, and my client, Construction Systems, was on the project for approximately a year. They had not received payment, or they received checks that had bounced, and at the time that they had left the project, they were owed $3,146,200. Construction Systems hired defendant Fagelhaver to record a mechanics lien on the property. On April 3, 2003, Fagelhaver performed a track index search for the property. That search did not include Cosmopolitan Bank and Trust. Cosmopolitan's lien wasn't of record as of that date, right? But on May 6, 2003, about a month later, Cosmopolitan recorded its mortgage against the property. On August 6, without updating its April 2003 search, Fagelhaver served a notice of lien upon the contractor and the owner. They did not include Cosmopolitan as the mortgagee on that notice. And on October 6, 2003, Fagelhaver recorded its mechanics lien on behalf of my client, Construction Systems, with the Cook County recorder of deeds. The mechanics lien recorded by Fagelhaver did not include Cosmopolitan as an interest of the party, and Cosmopolitan was not on the service list. As of the date the lien was recorded in October 2003, had the pinnacle litigation already been filed?  And the pinnacle litigation was a number of subcontractors suing the owners and the general? That's correct. There were at least 25 subcontractors that were all joined in this pinnacle litigation. My client was one of them later on. Okay. So as of the time that the mortgage, excuse me, at the time the mechanics lien was filed and recorded with the Cook County recorder of deeds, Cosmopolitan was not included on the service list and not given notice of it. And as a result of Fagelhaver's failure to do so, the mechanics lien was not proper under Section 24 of the Illinois Mechanics Lien Act. It was not perfected. Fagelhaver did perform a second track search on December 19, 2003. That track search revealed Cosmopolitan as an interested party. However, since Cosmopolitan did not receive notice, the lien was not properly perfected. And then as a result of that, Cosmopolitan's mortgage took priority over Construction Systems lien. Under Section 24, a prior, excuse me, a perfected mechanics lien would take priority over the mortgagee. So if Construction Systems lien was properly perfected, they would have been entitled to receive the $3,146,000. As a result, they fell into a list of creditors, including other subcontractors, and when the building eventually was sold and those claims resolved, they came farther down the list and had to take about a $1.3 million loss regarding the amounts that was owed. Does the record show that whether other subcontractors who recorded prior to Cosmopolitan received 100% of their lien amounts? Yes. There was a deposition taken of, I'm trying to remember her name. She represented the bank in negotiating the settlements. And Jennifer Nielsen is her name. And those subcontractors that had perfected their liens came above Construction Systems and did receive that, receive those amounts as full. On August 28, 2004, Fayetteville Haber was allowed to withdraw as counsel of Construction Systems. And that was because Fayetteville Haber refused to turn over the file until the issue of outstanding legal fees was resolved. Did Fayetteville Haber send copies of pleadings with regard to the Pinnacle case to the Supreme     No. No. No. No. No. No. No. Did they send copies of the Pinnacle case to their client, to you? No, not a complete set. There were some documents but there was not a complete set of records from the file. What about records as to what was going on in the Pinnacle case? There were some documents that were ... At that time, had the theories that construction used to collect on its lien been flat? No. At that time, when Karen Barris took over the file, it was understood that construction systems lien as a subcontractor was properly filed. There were later ... She understood that? She understood that. And what is the record? I know she said she wasn't aware of the ... Right. It wasn't until in the Pinnacle case, in that point it was 2006, 2006 I believe, when there were cross motions for summary judgment. And the bank brought up for the first time that the lien was not properly recorded and therefore they weren't a subcontractor and they weren't entitled to receive any money. And that's where there was ... There's an argument that counsel would be making in regards to the status of whether they're a contractor or subcontractor. And at that time, Karen Barris made the argument that the construction system was a contractor in order to try to bypass the malpractice that the Section 24 lien was not properly perfected. So at the time that Karen Barris took over the case, there was no understanding whatsoever that any of this had happened. And in fact, for the next year of litigation, the parties believed that the Section 24 notice was properly recorded. I would assume that she would have looked at the pleadings that she did have and knew that Covenant Topolitan was part of that lawsuit in 2004. Yes. However, she testified in her deposition and her affidavit that she did not receive the whole file. It really wasn't clear as far as her deposition testimony what exactly was received, but her testimony is clear that she did not have notice whether the Section 24 notice was perfected at the time she got involved in the case. So did she have a copy of the Section 24 notice before the agreement was signed? I can't say for sure, only that she testified that ... She didn't have the whole file. And she had no notice that there was something wrong with the lien or there was any malpractice committed at the time that they took the file over November of 2004. So really the first issue that we have before is whether the mutual general release is a general release and the terms that are included on page 2 of the second paragraph, any and all claims on known and unknown controls, or whether the release itself is a specific release and it only covers the parties' dispute over legal fees and the return of the case file to the client. And I state that the release itself is approximately two and a half pages, and in that two and a half pages, the terms of outstanding balance, indebtedness, and settlement of payment funds are set at 12 times. So I don't believe this is a general release as Fable-Haber has claimed, but in fact a specific release with specific terms only involving the parties' dispute over legal fees and the return of the case file to the client. And since it is a specific release, we need to look at the intent of the parties and drafting a new understanding. And it's clear from the testimony of Perry Haber, who is the vice president of construction system, as well as Karen Barras, that at the time the release was entered in November of 2004, that neither of them had any idea that the loom was not perfected or there was any malpractice on behalf of Fable-Haber. But the release does say, without limitation, any claims in connection with the legal services. And in that same sentence it also says, or the indebtedness. Once again they're talking about the indebtedness, 12 times in two pages. But it does mention the legal services. Yes, it does. It didn't have to. I mean it could have just, it would have seemed that that was clearly stated that it was in addition to the indebtedness that the parties were just going their own way. It could have been stricken out. It was included as attorneys. We all have thrown in any and all, known and unknown, all that type of language. However, looking at the release itself, those three terms, indebtedness, payment of settlement funds, are used 12 times. But then it says both known and it says unknown. It says, without limitation, any claims in connection with the legal services. So if you read it strictly, it's right there. Well, the cases that we look at, like AIG, where the courts have allowed the intent of the parties to be considered when deciding whether to release the language of the release. I mean it's clear from this case that no one from Fayetteville ever believed they had committed a malpractice or they would have had to include malpractice, that specific language, in the release. They wouldn't have been able to exclude malpractice if they had thought they committed malpractice at that time. But is your position that the language of the release is not ambiguous? It's not ambiguous, but since it contains specific terms of indebtedness, outstanding balance, settlement of funds, over and over and over again, that that was the specific intent of the parties for this release was to include. And the sole purpose of the release was to resolve the dispute over legal fees and the return of the client file. So you could say, okay, Fayetteville Havre gave construction systems a bill for X amount of money, and that was the bill. And so you're saying that this release could be read to say we're talking about the indebtedness, but anything or all that comes after this about the bill. You can't come in later with another bill. You can't come in and ask for more money later. Right. That sort of general language really refers to the legal services. There's not going to be any more claims on legal services. Right. And as you can see, the amount of indebtedness is spelled out as $81,000, and there's a payment plan put in place for $60,000, three payments of $20,000 apiece. And in fact, one of the conditions of the release was that upon the first payment of $20,000, Fayetteville Havre would return the entire client file within 72 hours, and that didn't happen either. But as far as your point, Your Honor, yes, that's what the release is. The intent of the release was to resolve the outstanding fee dispute, and that's why there are specific terms, specific payment plan, and that was the purpose of the release was to finish out and ending all disputes between the outstanding indebtedness. If that's true, then why would there be an or between the legal services provided and the indebtedness? It does not say and the indebtedness. It does say or. But, again, my reading of the release is that it has specific terms. And in fact, the next paragraph, it's in regards to construction systems, if they breach. So if they do not pay in full settlement, and again, it talks about in connection with the legal services and or the indebtedness. So they wouldn't have a breach. Construction systems wouldn't have a breach regarding the legal services. They would only have a breach regarding the indebtedness. So I think from the language of the release itself. So you're saying those legal services are really the billing part of the services. It's the billing part of the services. That's not anything they might have done. Right. And I think it's pretty clear from the testimony of Perry Havre, as well as Karen Bares, that that was the intent and that was the only understanding was this release was the sole purpose, was to pay off the amounts that were owed and then to receive the client file. One of the conditions, as I just mentioned a moment ago, was that Faygo Havre was to return the entire client file within 72 hours. And Ms. Bares testified that that didn't happen. And, in fact, she sent a letter in February of the following year saying, I'm still missing items from the file. So even if the release can be read as ending all legal services, Faygo Havre did not meet its part of this bargain and breach the release by not turning over the file within 72 hours of receiving the first payment of $20,000. Do we have any reasons in the record as to why it took them so long? No, I mean they were supposed to turn over the file within 72 hours. Months later they still hadn't completed it. Because they wanted to receive their $80,000 bill. Well, they were supposed to turn over the file within seven days of withdrawing from the Pinnacle case anyhow, right? Right. And they didn't do that. No. And we were talking November. Now there's a release and a $20,000 payment and now they're turning over the file. But they had a retaining lien under the law. They have a common law right to retain the file. And I'm not disagreeing that they were owed money, because obviously they were owed money in this. That's the whole purpose of why they entered this release, to resolve that outstanding fee issue. But the agreement said, once we have this agreement, we're going to give you the file in 72 hours and we're paying. And what you're saying is they just held it until they got more payments. Karen Barris testified that she did not receive the entire file. And she never felt that she even received the file. After her letter in February of 2005, she still didn't feel like there was everything. Now, I'm sure construction, excuse me, I'm sure Fayetteville Hability will say, well, some of those items were their own inter-office memos and notes. I mean, those were produced to us as a part of this litigation. And, I mean, those documents were not produced to Karen Barris in the underlying case. So how much was actually held out, I can't say for certain. But, I mean, it's Karen Barris' testimony that she did not receive the entire file. The burden is on Fayetteville and Hability to show that they disclosed that you had information about the potential malpractice. Yes. If an attorney commits malpractice, I mean, they have the obligation to inform the client. And certainly the words malpractice were not included in the release. And there weren't any discussions. The testimony from all the parties involved was clear that there wasn't any discussions about malpractice at the time the release was entered. So the Mechanics Lane complaint was filed by Pinnacle on May 23rd of 2002. That's correct. Fayetteville Hability was representing construction systems. Yeah. They did this second track search on December 19th of 2003. And they didn't withdraw as construction systems attorney in the Pinnacle case until August of 2004. Yes. So between the time that they knew that they had missed something, they had missed Cosmo Bank in December of 2003 and August of 2004, they had eight months to tell their client, oops, there's a problem here. Yes. And just so it's clear, because it's not really that clear from the underlying case, the Pinnacle case wasn't filed by my client. It was filed by another subcontractor. And then everybody eventually got added into it. Right. But, yes, I mean, there was a period of time that this could have been addressed and been told by Fayetteville Haber to construction systems. Well, Fayetteville Haber filed a motion. The court clerk's docket is sort of a mess on this case. As best I could figure out, Pinnacle filed an appearance for construction system on July 30th of 2004 in the Pinnacle case. Okay. That's what it says. It actually says Behrs filed that appearance, but that would make no sense because 28 days later Fayetteville Haber filed a motion to withdraw. So I think the clerk's system has flipped over. But you're right, it was hard to tell who did what. But it is clear that Fayetteville Haber withdrew on August 28th of 2004. So between December of 2003 and August of 2004, they certainly had a client relationship with construction systems. Yes, they were still involved in the case and representing them. And they didn't say, oh, wait, there's a problem here? No. Okay. From what I can tell from the underlying case, the Pinnacle case, the first time that there was a mention that the Section 24 notice was not properly recorded was when the cross motions for summary judgment were filed. And Judge Quinn was the judge residing over that case. And he denied both motions for summary judgment without ruling out any substantive facts. It just says motions are denied. And when Kathy Behrs took over the Pinnacle case, what, if anything, stopped her from double-checking construction systems, laying against Cosmo Bank, against the developers? Nothing would have stopped her. She just relied upon the work that was performed by Fayetteville Haber. I mean, that's the purpose why Fayetteville Haber was retained in this case. Ms. Behrs represented construction systems prior to this case and on a number of different issues. And they specifically went to Fayetteville Haber for their expertise in this field. Mechanics leads? Mechanics leads. Thank you. Especially on a building, a project this big, that there were so many people involved. What about the claim for prejudgment interest? Under the Mechanics' Lien Act, a subcontractor and a contractor are entitled to prejudgment interest. It's our position that Fayetteville, excuse me, construction systems would have been entitled to prejudgment interest if not for Fayetteville Haber's malpractice in not perfecting the lien. So as a part of those damages in the legal malpractice case, then construction systems should be awarded those prejudgment interests. In the Tri-G case that the trial court relied upon in denying that and striking that, the court did say, as well as settle, that interest is not recoverable absent a statute or agreement providing for it. Well, we have a statute in this case. We have the Inland Mechanics Lien Act, and under 770 ILCS 60-21A, that is the subcontractor defined, and construction systems fits that criteria. Every person who shall furnish labor services shall be known under this act as a subcontractor and shall have a lien for the value with interest on any amount from the date the same as due. And even under the other theory that construction systems may not be a subcontractor but be a contractor, that's 770 ILCS 60-1-A, and that's any person who improves the lot or tract of land is known under this act as a contractor and has a lien upon the whole of such land for the material labor services and interest at the rate of 10% per annum. It's part of the damages. It's a part of the damages. In any legal malpractice case, the case within the case, you're entitled to whatever damages that the party would have received if they were made whole, if not for the legal malpractice. So under the mechanics lien, construction systems would have been entitled to receive that pre-judgment interest under the statute. So therefore, as a part of our damages on the malpractice case, that should be also included. Thank you. Thank you very much. Good morning again, Your Honors. Again, Karen D. Graham for the appellee, Defendant Fagel-Haber, LLC, now known as Thompson-Coburn LLP, but we've referred to the defendant as Fagel-Haber throughout the brief, so I'll stick with that today. May it please the Court, Counsel. First, I'll address the release, and today I heard two arguments from the plaintiffs that haven't been made before. One thing I can say that we do all agree on, including the plaintiff as well as the defendant, is that this document has no ambiguity in its terms. And yet, notwithstanding that acknowledgment by the plaintiff, the plaintiff takes the position that a wealth of parole evidence should be considered by the court to determine the intent of the parties. And I think the case law of this district and of other districts is very clear that the intent of the parties should be gleaned from the four corners of the document, given the fact that there's no ambiguity. But saying that the language of a release is unambiguous is one thing, and saying what the parties intended to release is another. Isn't the context always considered in determining the scope of a release? I believe the circumstances are considered to give context to the release, and the outside circumstances, if you will, are considered more or less, depending on how much detail is provided in the release, that gives the court an idea of the circumstances. But as far as coming in with sworn testimony or an affidavit that says, notwithstanding the general and specific language, which is what we have in this document of the release, I didn't intend anything about legal malpractice to be included, and I don't think that's correct under the case law at all. The reason we can look at it, there's 12 times, apparently, that there's mention of the indebtedness. So obviously the whole intent of this document looked at as a whole, which we should do, is the indebtedness. The indebtedness is one of the specific issues that's raised. The other part of this, and until today, counsel, or rather I should say, constriction systems, hasn't even acknowledged the fact that the phrase legal services was included in this release, and took the position throughout the briefing that the words legal malpractice actions had to be contained for legal malpractice actions to be released. And I think that flies in the face of this document, and of common sense. The plaintiff, up until today, hasn't even acknowledged that that phrase is in this release, and it refers to disputes and disagreements that have arisen between Fayetteville Haber and CSI, including without limitation, with regard to the indebtedness. And the releasing language refers to any and all claims, causes of action and so forth, existing at the date hereof, or hereafter arising, known and unknown, and releases without limitation any claims in connection with the legal services provided, or the indebtedness. But do you agree that the constrictive services had no idea about the potential malpractice claims? I don't know that that is what Karen Barrett says, and that is what Perry Haber says. We don't have any other evidence. You're burdened. What other evidence do you have? Well, one of the issues that was emphasized by the plaintiff in the brief, and today in the argument before the court, is the issue of did Fayetteville Haber comply with this obligation to turn over the file. I think it's important for the court to recognize that that issue, as far as the enforcement of the release is concerned, has been forfeited. It wasn't raised at all in response to the motion for summary judgment. It was raised in a prior motion to dismiss, but it was not raised in the motion for summary judgment, and interestingly, in the response to the motion for summary judgment, the plaintiff incorporated other parts of the briefing and a prior motion to dismiss, but not the certain reply where that issue was raised. That's a whole different thing. It is. Let's just head out of the site. I'm sorry. If there was a potential malpractice claim, doesn't Fayetteville Haber have an obligation in nine months to say something to the claim? I don't believe that it does, Your Honor. If a doctor commits malpractice and he has a bill, say the bill is $20,000 and I resolve it with my doctor for $10,000, and thereafter I find out that there was a malpractice claim and damages are in the hundreds of millions of dollars, I just blew it because of the bill. It was all about the bill. I didn't have any idea. The doctor knew, but I didn't know. Well, there's no indication on this record that there was some knowledge by the firm, but more importantly — Yes, there was, because the firm filed it, then they go back, and then they find out about cosmopolitan. They are supposedly holding themselves out and were hired to be mechanics being lawyers. So they knew darn well what they had to do. And that's what they filed it. At the time they filed it, there was no — it wasn't there, but it was there later on, and they should have waited. Once they filed that lien, that was it. So they blew it. And what you're saying is, under the law in this situation, we have a gotcha. Is that what you're saying? No, I'm not saying that at all. What I'm saying is, under the law, and what the trial court recognized in enforcing this release, and I think rightly so under the law, is that the plaintiff was represented by independent counsel when this release was negotiated and entered into. And the release specifically recognizes that. And as far as the question of whether there was some kind of a position taken by the bank, and that didn't occur until later in 2006 or what have you, there's a letter in the file that demonstrates that Karen Burris was aware of, or at least raised a question about, notice in February of 2005. And that was after the release was signed. But there's also correspondence in the file, in the court file, that shows that the pleadings and orders were transferred from the firm to Karen Burris in October, a month before the release was signed. So, you know, we have a situation where we have a recognition, an explicit recognition, and a release that has both general, comprehensive, clear and unambiguous language, and also the specific language that doesn't release only the claim for fees, but also releases anything that arises out of legal services. What arises out of legal services? Today is the first time I've heard counsel make an argument, and I don't think this is anywhere supported in the record, that what they were talking about is, well, gee, they held on to the file because they wanted to get more fees. I don't know of anything in the record that supports that. And also, today for the first time, counsel makes the argument that when, to the extent that legal services is mentioned, that must mean future attempts to recover. I don't see how that makes sense in the light of the language of this release. And I also have to, I'm sorry, Your Honor, please. How do you reconcile the fact that Fagel Haber is a fiduciary vis-a-vis construction systems? And there's nothing in the record that I have seen that between the second track search, when Fagel Haber discovered Cosmopolitan's interest, that was of record prior to the date the lien was originally filed. And the time it withdrew, eight months later, it said nothing to its client about any potential problem with the lien. Then withdrew, and now says, well, you know, either you should have known, or we knew and we didn't tell you. Well, Your Honor, I think that the emphasis that the court put on construction systems representation by separate counsel answers that question. But that was before the file was turned over. The file was turned over actually beforehand. It was turned over according to correspondence sent by Karen Berris to Fagel Haber in October of 2004. The pleadings and the orders were provided to her. Okay, so the pleadings and the orders aren't going to tell her that she should be looking for malpractice. Well, Your Honor, when she advises her client to execute a general release that also specifically encompasses anything known or unknown that arises out of legal services. Who used that language? That language is contained in the release. Fagel Haber, right? Didn't Fagel Haber draft it? I believe they did, but this was also reviewed. It wasn't a matter of some of these other, you know, akin to some of these other cases where you have an unsophisticated party that is not aware of these kinds of things. Perry Haber's own testimony was that he was unhappy with the legal services. He was unhappy with the length of time the case was taking, the amount of fees that Fagel Haber was billing, and the fact that he hadn't gotten any recovery on a mechanics lien that at least he thought was a dead-bang winner. Well, he made it clear that he had disagreements with the way they were handling the case, and that was clear from his deposition testimony. And Karen Bierce had the file. She had portions of the file. Exactly what portions of the file are not entirely clear. But it seems to me that the question of whether Fagel Haber, and this was raised in plaintiff's brief but not raised before the court on a motion for summary judgment, had complied with his obligation to provide the file is not clear. So I don't believe that that excuses the plaintiff from this release, which encompasses, if it doesn't encompass legal malpractice claims, why would Fagel Haber be giving up a portion of the amount of money that's owed to it? What about Thornwood? Well, one reason would be to be paid. Then they got some money. Otherwise, there's a big dispute. There's no money being paid. Well, it seems to me that Because law firms compromise all the time on their fees. They compromise, but in this case, the consideration for compromising was the plaintiff's giving up any claims arising out of legal services. Well, I think Katherine's mentioned something I want you to explain to me. What does it mean when it says that Fagel Haber, this is a paragraph after the CSI release, it says Fagel Haber for itself, so forth, will release any claims in connection with the legal services provided by Fagel Haber to CSI. That's what it says, right? It makes no sense, right? It says that Fagel Haber will release, without limitation, any claims in connection with the legal services provided by Fagel Haber to CSI. I think the idea is that it's releasing any action it would have against CSI. For more money. For more fees. Right. Which is exactly, if that's what it says, for fees, then that's probably what it means above. So it should be the same. But the other language doesn't discuss fees. It says it has the broader, although still more specific term, of anything arising out of legal services. No, it says any claims. So it's a Fagel Haber release. That's the point. The same words. It's the same words. So you're saying, for some reason, the same words mean different things depending on what paragraph it's in. I don't understand. The common sense meaning of legal services has to be broader than simply a fee claim. And there's no legal services, there's no legal malpractice claim that could be brought. I'm not sure I understand the court's question. First of all, we should read this as narrowly as possible. Your other draft. So it says that Fagel Haber is releasing any claims in connection with the legal services provided by Fagel Haber CSF. I mean, it's just the same language. The book paragraphs are the same. But can't that encompass legal malpractice claims as well as any claims for fees? I think it clearly does. You want to address the prejudgment interest? I can certainly do that, Your Honor. And there's another very significant issue that I believe provides an alternative basis for the court to affirm the judgment. But to briefly address the prejudgment interest, I think that the Tri-G case lays that issue to rest. Because what the plaintiff pleaded in the amended complaint was a recovery for prejudgment interest, which under Tri-G is not allowed. The specific statute that the plaintiff cites is narrowly construed and only allows for that type of recovery to a limited section or under limited circumstances and against limited parties. It doesn't apply to legal malpractice actions. And that's the very reason. In a legal malpractice action, you're always trying the case within a case. If the lawyer would not have committed malpractice, I would have prevailed and I would have recovered X amount of money. If it's a mechanics lien matter that is the underlying case and prejudgment interest is available under that statute, why isn't that a component of construction system's damages against Fagelhaeber? It's not a component of the damages because this is a legal malpractice action quite simply, Your Honor. And it's not a... But what are the damages in a legal malpractice action? I mean, you're saying like it's a legal malpractice action. So... But the plaintiff... Tell me what are the damages that they could ask for here. The plaintiff can ask for damages that make the plaintiff whole. But in the specific instance of attempting to assert claims for punitive damages that could have been recovered in the TRI-G case or for prejudgment interest that could have been recovered in the TRI-G case... When I'm talking TRI-G case, I'm talking what we have before us, construction services. What damages can construction services ask? Well, generally speaking, they can ask for the damages that they contend they would have recovered but for their allegations of negligence. Exactly. You are correct. And therefore, that would include under the Act prejudgment interest. I don't... Under the Act concerning mechanics lien. We're not talking about prejudgment interest on the malpractice claim. We're talking about the case within the case, which is what Justice Mason was talking about. So it seems that you would then agree that, I mean, part of the damages, the mechanics lien, it sets forth what the damages are going to be. And part of that is the prejudgment interest. But the way that the Supreme Court has analyzed that specific issue, Your Honor, is to say, you know, to the extent that a party was seeking prejudgment interest in a legal malpractice case... What the plaintiff was arguing in Trigee was that I would have recovered my judgment several years ago. And therefore, I want prejudgment interest on that judgment against my lawyers because their malpractice prevented me from recovering that judgment. That seems to me to be different from saying in a mechanics lien case, if that's the underlying case, the plaintiff would have recovered prejudgment interest on the mechanics lien. And therefore, if the lawyer's malpractice prevented that, the lawyer is liable for prejudgment interest as a component of the plaintiff's damages. I think that this is further explained, Your Honor, in the Goldstein case where the court distinguished between damages that can be recovered on a hypothetical judgment, which I think is what the plaintiff is asking for here, versus the damages that are allowable in a legal malpractice case. Well, how is this hypothetical? I mean, this isn't a hypothetical at all. But to the extent that they're asking for prejudgment interest, and I'm afraid we're going in circles here, the statute does not apply to a legal malpractice claim. And the other aspect... But that's not the damage. The damage is, as we spoke about, is to make them whole, right? Right. And part of that would have been the prejudgment interest, which they would have received had the malpractice not occurred. Well, I think that is further called into question by the fact that they released that. They released that claim. Well, that's a different argument. So I do think it's different, and I think it's not allowed under F.R.G. and GoFundM as well. May I briefly also address the question of judicial estoppel? And I think that that is an additional basis that's fully developed in the record that calls for affirmance of the judgment. Under the judicial estoppel elements, did the plaintiff take inconsistent positions in two separate proceedings? Factually. Factually. Under oath, and receive a benefit in the earlier proceeding? And it seems to me that the only basis that the plaintiff is opposing that doctrine, if you're in the plaintiff's reply after I raised it in the response, basically two. Number one is the plaintiff takes the position that there was not a factual inconsistency. The plaintiff takes the position that it was an alternative legal argument. But that doesn't account at all for the sworn testimony of the officer. In fact, that's not even addressed in the plaintiff's reply brief. The sworn testimony was whether the court looks at this as inconsistent positions or inconsistent factual testimony, we prevail under either analysis. Because what the plaintiff did in the pinnacle litigation was to say, okay, Section 24 does not apply because the contract was with, directly with the owner. And that is based on, that was an argument that was addressed by Ms. Barris based on the sworn testimony and deposition affidavit of Mr. Haberer. And that's not ever addressed by the plaintiff. But Mr. Haberer really doesn't know the makeup of the entities he's dealing with. And aren't these alternative arguments just an attempt to salvage whatever construction systems can from its lien? I don't think so, Your Honor. And for two reasons. Number one, it is a factual statement. This man has been an officer in this company for 25 years. He's not an unsophisticated person. He knows who he's entering into a contract with. And he gives completely different testimony in this case. So that's one issue. And I don't see how the plaintiff can take that position. And then also within the confines of the concept of judicial estoppel, which is there's no case that says, well, if you have to take an inconsistent factual testimony because you had a problem with your lawyer, that somehow excuses it. It's not a matter of looking at what's the equitable or fair way of dealing between these two parties. The whole idea is to protect the integrity of judicial proceedings. If in the Pinnacle litigation, construction systems just laid down and said, you're right, we didn't give notice, we were required to give notice, and therefore our lien is inferior, Wouldn't Faglehaber have an argument in this case that construction systems failed to mitigate its damages? I'm not saying that they can't avail themselves of various arguments. I'm saying that when you take a position based on sworn factual testimony that later is diametrically opposed, you have a problem with judicial estoppel. And as far as the question that the plaintiff raised of CSI incurring any benefit as a result of taking those inconsistent positions, I don't think there's any way to get around the Badani and the Smilas cases, which say, if you have a settlement, you don't have to have evidence of a direct link between taking the inconsistent position or giving the inconsistent factual testimony and the settlement. That can be discerned as, that can be regarded as the party prevailing based on common sense. And it seems to me pretty clear from the motion for summary judgment that was filed by the bank and then the subsequent settlement for $1.8 million after the motion for summary judgment was denied, that there was a benefit to CSI. I don't see how that can be squared with the precedent of this court, most recently in the Smilas case. The plaintiff doesn't take issue with any of the other elements of judicial estoppel, and I think that they have to be estopped from changing their testimony from the prior case under that doctrine. So for those, based both on the release and on the doctrine of judicial estoppel, we'd ask that the court affirm the judgment that was entered in favor. Thank you very much. I just would like to quickly address two points, the first being that the 72-hour requirement was not fully addressed in the motion or response for the motion for summary judgment. As we're all aware, there's a strict page limit. These arguments were previously made as a part of a motion to dismiss. They were included in our server apply. They were also included in answers to the first, second, and third affirmative defenses. Counsel's firm had the opportunity to file a brief in support of its motion to dismiss after receiving the server apply. So those issues were argued by both sides and incorporated by reference along with several other arguments. I don't know, Mr. Rudnick. When I was a trial judge, I would never let lawyers say, and by the way, I know I'm at my 15-page limit, but there's another 10 pages I want you to look at in a prior motion. I would never let them do that. Your Honor, I was going to tell a story from being in front of you that I shared with counsel, but I'll skip that. That would be a good idea. Yeah, I'll skip that. As far as the judicial estoppel, this was previously addressed in the response to summary judgment, but there were two different legal theories that Barris had to put forth because of construction systems malpractice. Barris was forced to do that because construction systems now perfect the lien. They perfect the lien. Fagelhaber. I'm sorry, Fagelhaber perfected the lien. So it's not that important the way I look at it, whether Perry Hager, and as a part of the background, this was a big proposal that AMAC, as the general contractor, accepted, but whether there was an official contract with who and who signed what, it's all been very complicated because that's the way this whole project was, who was approving what, who was doing what. There actually was no signed contract at some point, right? I've never found a signed contract. I found a big proposal. There weren't any signed authorizations for the add-ons before the add-ons were done. I think some were signed after. Some were signed afterwards. That's correct. And who was signing them, and like I said, one of these owners went to jail, another one fled the country. So there's problems with who was authorizing what and who was doing what. But as far as whether Hager knew who was the owner, who was the contractor, who was the sub, that's not really important because what's important is Faygo Hager thought the construction system was a subcontractor because they filed the Section 24 notice. And based upon that, I ask that you reverse or amend the case back to the trial court for any future proceedings. Thank you. Thank you. I'd like to thank the council for their excellent arguments and excellent briefs. We'll take this case under advisement. We're going to step out and change panels, and then we'll be right back for the next case.